IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| C.P. | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | FILE NO.: _______________ |
| | : | |
| SHIV GLOBAL HOTEL, LLC d/b/a Knights Inn and GLOBAL MANAGEMENT & INVESTMENT CORPORATION d/b/a Knights Inn, | : | |
| | : | |
| Defendants. | : | |

**COMPLAINT**

Matthew B. Stoddard
Patrick J. Hannon
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
matt@legalhelpga.com
Pat@legalhelpga.com

**Attorneys for Plaintiff**

## TABLE OF CONTENTS


*INTRODUCTION* ........ *4*

*THE PARTY PLAINTIFF* ........ *6*

*THE PARTY DEFENDANTS* ........ *6*

*JURISDICTION AND VENUE* ........ *7*

*FACTUAL ALLEGATIONS* ........ *8*

**I. Human Beings were Trafficked for Sex at Knights Inn.** ........ **8**

**a. C.P. Was Trafficked for Sex at the Knights Inn.** ........ **8**

**b. K.M. Was Trafficked for Sex at Knights Inn.** ........ **9**

**c. M.P. Was Trafficked for Sex at the Knights Inn** ........ **12**

**II. Defendants' knowledge of C.P.'s trafficking.** ........ **14**

*COUNT 1: TVPRA CIVIL BENEFICIARY CLAIMS* ........ *16*

**I. Defendants Knowingly Benefited.** ........ **17**

**II. Defendants Took Part in a Common Undertaking.** ........ **17**

**III. The Undertaking Violated the TVPRA.** ........ **18**

**IV. Defendants Had, at Least, Constructive Knowledge.** ........ **20**

**a. Industry Knowledge ........................................................................21**

**b. The Online Reviews ........................................................................25**

**c. The Law Enforcement Activity ........................................................26**

**d. The Signs and Symptoms of Plaintiff's Trafficking ...........................28**

**V. Proximate Cause and Damages under the TVPRA ...............................30**

***PRAYER FOR RELIEF .........................................................................32***

## INTRODUCTION

1. This lawsuit is brought by a sex trafficking victim against Defendants, and it seeks damages under the Trafficking Victims Protection Reauthorization Act's (TVPRA) civil beneficiary provision. *See* 18 U.S.C. § 1595(a) (stating that a sex trafficking victim "may bring a civil action against . . . whoever knowingly benefits . . . from participation in a venture which that person knew or should have known has engaged in an act in violation of the" TVPRA); *see also Doe #1 v. Red Roof Inn, Inc.*, 21 F.4th 714 (11th Cir. 2021); *Ricchio v. McLean*, 853 F.3d 55 (1st Cir. 2017).

2. This lawsuit also seeks to hold Defendants liable under Georgia's Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO"), which makes it is unlawful for anyone to, among other things, acquire an interest in or control of money or property through "a pattern of racketeering activity." O.C.G.A. § 16-4-4(a).

3. On August 15, 2013, Defendant Shiv Global Hotel, LLC purchased a Knights Inn hotel located at 2859 Panola Road, Lithonia, Georgia, (hereinafter the "Knights Inn") and continues to own that hotel to this day.

4. Defendant Global Management & Investment Corporation has (together and in cooperation with Shiv Global Hotel, LLC) operated and managed the Knights Inn from approximately August 2013 through the present.

5. The Plaintiff C.P is a victim of sex trafficking at the Knights Inn during Defendants' operation and management of the facility. Given the nature of the case, she is identified in this Complaint by her initials to prevent public disclosure of her name. When filing this Complaint, Plaintiff's counsel also filed a motion seeking Court permission for C.P. to proceed anonymously. Plaintiff's counsel will disclose the full name of C.P. to defense counsel. Upon information and belief, Defendants will consent to C.P. proceeding without publicly disclosing her name.

6. All Defendants aided in the operation and management of the Knights Inn.

7. Defendants' Knights Inn currently is, and at all times relevant to this Complaint was, a notorious hotspot for illicit activity that has been attracting sex trafficking and prostitution ventures for years.

8. The purpose of this lawsuit is to hold Defendants responsible for their role in making money from the trafficking of C.P. and to help prevent the trafficking of new victims by forcing Defendants to change their conduct.

## THE PARTY PLAINTIFF

9. C.P. is a resident and citizen of Columbus, Georgia, and she consents to the jurisdiction of this Court.

10. From approximately January 2014 to May 2014, a man known only as "YG" trafficked C.P. for sex at the Knights Inn. C.P. was sixteen years old at the time of her trafficking.

## THE PARTY DEFENDANTS

11. Defendant Shiv Global Hotel, LLC is a Georgia limited liability company that owned and operated the Knights Inn in Lithonia, Georgia during the relevant period.

12. Defendant Shiv Global Hotel, LLC can be served through its registered agent: Joel M Haber at 2030 Avalon Parkway, Suite 200, McDonough, GA, 30253.

13. Defendant Shiv Global Hotel, LLC was properly served with process in this matter.

14. Defendant Shiv Global Hotel, LLC is subject to the jurisdiction and venue of this Court.

15. Defendant Global Management & Investment Corporation is a Georgia corporation that operated and managed the Knights Inn in Lithonia, Georgia during the relevant period.

16. Defendant Global Management & Investment Corporation can be served through its registered agent: Krishna Patel at 285 Country Club Drive, Suite 100, Stockbridge, GA, 30281.

17. Defendant Global Management & Investment Corporation was properly served with process in this matter.

18. Defendant Global Management & Investment Corporation is subject to the jurisdiction and venue of this Court.

## JURISDICTION AND VENUE

19. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question jurisdiction) because this matter concerns the TVPRA, which is a law of the United States.

20. Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Lithonia, Georgia, which is within the Northern District of Georgia's Atlanta Division. *See* 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### I. Human Beings were Trafficked for Sex at Knights Inn.

#### a. C.P. Was Trafficked for Sex at the Knights Inn.

21. In 2010, then 12-year-old C.P. was placed in a group home.

22. In 2013, after running away from the group home, 15-year-old C.P. met a trafficker known only as “YG-Kash” or “YG”.

23. From approximately January 2014 to May 2014, YG trafficked C.P. for sex at the Knights Inn. C.P. was sixteen years old at the time of her trafficking.

24. Initially, YG took C.P. to the Knights Inn and trafficked her there for approximately one week.

25. After approximately one week at the Knights Inn, YG took C.P. to another hotel for approximately one week.

26. For several weeks during the period of January 2014 to May 2014, YG would take C.P. to the Knights Inn to traffic her for approximately one week and then spend approximately a week away from the Knights Inn before returning again.

27. YG took the commercial sex act proceeds.

28. YG used a portion of the proceeds of the commercial sex acts to pay for the rooms at the Knights Inn each night.

29. During these stays at the Knights Inn, YG paid for C.P.'s room each day in cash.

30. When C.P. stayed at the Knights Inn, Defendants always placed her and YG in a room on the back of the hotel and on a floor that appeared to be occupied almost entirely by prostitutes and their traffickers.

31. YG forced C.P. to have sex with men for money in the Knights Inn room, choking her on one occasion. YG also beat her and forced her to take drugs to keep working.

32. During these stays at the Knights Inn, YG required C.P. to engage in at least 7-8 commercial sex acts per day.

33. C.P. is not aware of whether YG is currently imprisoned for his actions.

**b. K.M. Was Trafficked for Sex at Knights Inn.**[1]

34. In November of 2013, K.M. was a twenty-one-year-old woman living in the Atlanta area.

35. K.M. was approached by Corey Andrew Hollie at a nearby Super 8 Motel, and Hollie told K.M. he would "help her."

---

[1] K.M's allegations are the subject of a separate lawsuit, Civil Acton File No. 1:22-cv-03968-JPB, Northern District of Georgia.

36. Hollie took K.M. to Defendants' Knights Inn and provided K.M with shelter and food in a room that he had rented from Defendants.

37. Hollie told K.M. that she would be working for him as a prostitute.

38. Hollie threatened violence and began screaming at K.M.

39. From approximately November 2013 through 2016, K.M. spent weeks at a time at Defendants' Knights Inn being trafficked as a prostitute.

40. The initial visit lasted approximately a week.

41. Hollie would switch rooms at the Knights Inn every few days.

42. In total, K.M. was trafficked at Defendants' Knights Inn for at least three months of every year from November 2013 through 2016.

43. Hollie would take K.M. to other places and then return her to Defendants' Knights Inn.

44. K.M. was sexually assaulted hundreds of times while at Defendants' Knights Inn with Hollie.

45. Hollie took the commercial sex act proceeds.

46. Hollie used a portion of the proceeds from each commercial sex act to book lodging at Defendants' property for the next night.

47. For many of the nights, Hollie had K.M. “working” in the same room as another victim named “KK.” Hollie had other girls working for him at the Defendants’ Knights Inn as well including “Cherry”, “Jules”, “Dior”, and a few others.

48. Hollie threatened violence unless K.M. completed the commercial sex acts.

49. Hollie frequently beat K.M. throughout the entire period.

50. Hollie similarly exerted force, fraud, and coercion on the other victims – also forcing them to perform commercial sex acts at Defendants’ property over and over again.

51. Due to Hollie’s “connections” and “friends” who worked at Defendants’ property, Hollie was given preferential treatment.

52. On many occasions, Defendants’ employees would warn Hollie and some of the victims that the rooms were “getting too hot,” and then Defendants’ employees would allow Hollie and the victims to change rooms.

53. On other occasions, Defendants’ employees would kick Hollie and his victims off property because there was too much foot traffic, but only for a few days.

After those few days, Defendants' employees re-rented rooms to Hollie so that his victims could continue being sexually assaulted at Defendants' property.

54. On multiple occasions, a manager named Yogi had sex with at least one of Hollie's victims – a girl named KK. It is unclear whether Yogi paid for that sex.

55. In 2016, and after being beaten multiple times, K.M. escaped from Hollie and from Defendants' property.

56. K.M. is not aware of whether Hollie is currently imprisoned for any of his actions.

**c. M.P. Was Trafficked for Sex at the Knights Inn.[2]**

57. In 2014, M.P. was a fourteen-year-old child who ran away from home.

58. In 2016, she met trafficker Deauntre Burnett in the Atlanta area.

59. Burnett thereafter coerced M.P. into believing that he wanted to become her boyfriend.

60. On approximately April 22, 2016, Burnett took M.P. to Defendants' Knights Inn.

[2] M.P.'s allegations are the subject of a separate lawsuit that is being filed in the Northern District of Georgia at the same time as this complaint.

61. Burnett rented Room 331 at the Knights Inn under his name, but he did not stay at the hotel.

62. Instead, Burnett required M.P. to stay at the Knights Inn hotel room while he solicited men to have sex with M.P.

63. While at Defendants' Knights Inn in April 2016, Burnett made then sixteen-year-old M.P. engage in commercial sex acts with men in exchange for money and to give nearly all that money to Burnett.

64. Burnett used a portion of the proceeds the commercial sex acts to pay for the room at the Knights Inn.

65. On April 26, 2016, M.P. was rescued from the Knights Inn by Dekalb County Police Officers after another 15-year-old victim called to report that she was robbed.

66. During the approximate four-day period that Burnett trafficked M.P. at the Knights Inn, Burnett required M.P. to engage in at least nine but possibly upwards of sixteen commercial sex acts with men.

67. Dekalb Police arrested Burnett on April 27, 2016, for the sex trafficking of M.P., and on March 30, 2017, a jury convicted Burnett of trafficking M.P. for

sexual servitude and other related charges. The Georgia Court of Appeals affirmed his conviction on June 14, 2023.

68. Burnett is currently imprisoned for his role in trafficking M.P. for sex at Defendants' Knights Inn.

**II. Defendants' knowledge of C.P.'s trafficking.**

69. C.P. was forced (through coercion, violence, and threats of violence) to have sex with men in exchange for money in hotel rooms at the Knights Inn in rooms that her trafficker rented from Defendants.

70. C.P.'s trafficker took the money from the commercial sex acts and used it to re-rent hotel rooms at Defendants' Knights Inn, and then that trafficker again forced (through coercion, violence, and threats of violence) C.P. to have sex with men in exchange for money while in the hotel rooms.

71. Defendants came to know each of K.M.'s, M.P.'s, and C.P.'s traffickers, and knew that each trafficker was trafficking each of them, and so Defendants would rent certain rooms to each trafficker that were in discrete locations in the back of Knights Inn and away from legitimate hotel business customers.

72. Defendants' front desk staff, housekeeping staff, security guard agents, and maintenance staff observed the following signs and symptoms of trafficking for C.P.:

a. malnourishment, poor hygiene, fatigue, sleep deprivation, bruising, cuts, and other physical injuries

b. lack of freedom of movement and constant monitoring by older men

c. no control over or possession of money

d. "uniforms" for each trafficking victim such as very high heels and cheaply made dresses that cover very little of a person's body

e. constant and excessive requests for towels and sheets to housekeeping

f. prohibition of some staff members to enter the hotel rooms

g. constant dirty sheets and towels with excessive bodily fluid and blood on them found in the rooms and many more towels and sheets that one person would use

h. large numbers of used condoms and some sex toys in the rooms

i. rooms rented daily by the same trafficker who would frequently pay with cash

j. a trafficker renting multiple rooms over and over again

k. extended stays by the victims without those victims having personal possession's other than their "uniforms"

l. a constant stream of male visitors entering the room one at a time, staying a short period, and then leaving, and

m. victims and traffickers being steered to the rear of the property and only given rooms in its "prostitution wing."

## COUNT 1: TVPRA CIVIL BENEFICIARY CLAIMS

73. The TVPRA provides a civil cause of action to victims like C.P. against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known" violated the TVPRA. 18 U.S.C. § 1595(a).

74. Under the civil beneficiary provision of 18 U.S.C. § 1595(a), a person is liable for knowingly benefiting from participating in a venture if the defendant "knew or should have known" that the venture committed acts that violated the criminal provisions of the Trafficking Victims Protection Reauthorization Act.

75. The "knew or should have known" language specifies a negligence standard. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 799-800 (1998) (acknowledging that "knew or should have known" refers to a negligence standard); *Amy v. Carnival Corp.*, 961 F.3d 1303, 1308 (11th Cir. 2020) (holding that a duty arises in a maritime negligence case when the defendant had actual or constructive knowledge which "hinges on whether it knew or should have known about the" risk creating condition); *see also Ricchio v. Bijal, Inc.*, 424 F. Supp. 3d 182, 193-94 (D.

Mass. 2019) (collecting cases on this issue); *A.B. v. Marriott Int'l, Inc.*, 455 F.Supp.3d 171 (E.D. Pa. 2020) (also collecting cases on this issue).

## I. Defendants Knowingly Benefited.

76. Defendants "knowingly benefited" from Plaintiff's trafficking because:

a. Plaintiff's trafficker rented rooms at Defendants' Knights Inn;

b. Defendants collected revenue from the room rentals; and

c. Plaintiff was forced to have sex in those rooms.

## II. Defendants Took Part in a Common Undertaking.

77. Defendants took part in a common undertaking or enterprise involving risk or profit with the traffickers because:

a. Plaintiff's trafficker would pay in cash for one night at a time, booking the next night's stay before check-out time;

b. Defendants directly rented rooms to people they knew or should have known were engaged in sex trafficking including the trafficking of Plaintiff;

c. Defendants were directly renting rooms to the same traffickers – Plaintiff's trafficker, as well as the traffickers of M.P., K.M., and others trafficking victims;

d. Defendants had commercial dealings with Plaintiff's trafficker and then continued to rent rooms to Plaintiff's trafficker.

e. Defendants had a continuous business relationship with Plaintiff's trafficker such that Defendants established a pattern of conduct with that trafficker.

f. After renting the room for the first night, Plaintiff's trafficker had prior commercial dealings with Defendants and then reinstated those dealings.

g. Defendants associated with Plaintiff's trafficker in an effort to force Plaintiff to serve Defendants' business objectives.

h. Defendants owned, operated, and maintained the Knights Inn in question.

## III. The Undertaking Violated the TVPRA.

78. The criminal portion of the TVPRA states, in relevant part, that "whoever knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing . . . that means of force, threats of force, fraud, or coercion . . . will be used to cause the person to engage in a commercial sex act, shall be punished . . ." under the TVPRA. 18 U.S.C. §1591(a).

79. Plaintiff's trafficker's undertaking with Defendants violated the TVPRA because the trafficker's conduct included following:

a. Recruiting Plaintiff and the other women to participate in commercial sex acts at Defendants' hotel by, among other reasons, stating that they would take care of them and then making them work as prostitutes;

b. Harboring Plaintiff and other women at Defendants' hotel for the purpose of having Plaintiff and the other women participate in commercial sex acts at the property;

c. Transporting Plaintiff and other women to Defendants' hotel for the purpose of having them participate in commercial sex acts at the hotel;

d. Maintaining Plaintiff and other women at Defendants' hotel for the purpose to having them participate in commercial sex acts at the hotel;

e. Renting rooms at the Defendants' hotel in which the commercial sex acts occurred;

f. Using force, threats of force, fraud, and coercion to cause Plaintiff and other women to participate in commercial sex acts at Defendants' property;

g. Withholding food or otherwise controlling the food supply, threatening violence, and/or actually engaging in violence to cause Plaintiff and other women to engage in commercial sex acts at Defendants' property;

h. Defrauding Plaintiff, such as by falsely telling a Plaintiff that he would take care of her, and then beating her and forcing her to work as a prostitute for him;

i. Coercing Plaintiff and other women to participate in commercial sex acts at Defendants' property by threatening physical harm if they did not continue to engage in commercial sex acts at Defendants' property;

j. Knowingly recruiting, enticing, harboring, transporting, advertising, maintaining, and/or soliciting Plaintiff and other women to engage in commercial sex acts in the hotel rooms that they rented from Defendants;

k. Selling to buyers who came to Defendants' hotel the "right" to have sex with Plaintiff, and then permitting the buyers to rape Plaintiff in Defendants' hotel; and

l. Other actions to be proven at trial.

80. The venture in which Defendants participated affected interstate commerce for numerous reasons including the sale and use of condoms, the purchase and use of cleaning supplies from out of state, the use of credit cards to post online advertisements through websites for selling Plaintiff in commercial sex acts, the use of interstate highways to transport Plaintiff to the hotels by her trafficker (and his associates), and other reasons to be proven at trial.

## IV. Defendants Had, at Least, Constructive Knowledge.

81. Defendants had actual or constructive knowledge that the undertaking violated the TVPRA, *i.e.*, Defendants had actual or constructive knowledge that Plaintiff C.P. was being trafficked for sex. *See* Fed. R. Civ. P. 9(b)("knowledge and other conditions of a person's mind may be alleged generally); *Sun Life Assurance*

*Co. of Can. v. Imperial Premium Fin*., LLC, 904 F.3d 1198, 1215 (11th Cir. 2018) (same).

82. Defendants directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at its hotel at all relevant times, giving Defendants specific and direct knowledge of sex trafficking, including the sex trafficking that victimized Plaintiff, and other crimes at Defendants' hotel during the relevant period.

83. Plaintiff C.P.'s victimization followed a pattern that was readily observable and should have been obvious to Defendants' hotel employees based on information available to the public at large and to the hotel industry.

84. Rather than taking reasonable steps to prevent sex trafficking, Defendants – in the quest for profits – created and maintained a business model that attracts, facilitates, and encourages the commercial sex market by providing a private and anonymous venue for traffickers and buyers alike.

**a. Industry Knowledge**

85. Defendants knew or should have known of the existence and prevalence of sex trafficking at budget motels and its illegality since the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' Palermo

Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children also in 2000.

86. Defendants knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child Protection Code of Conduct (the "Code") which outlines well-established best practices for the hospitality industry to combat sex trafficking, and identifies six simple steps hotels can take to prevent child sex trafficking, such as:

a. establishing corporate policies and procedures against sexual exploitation of children;

b. training employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

c. including a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

d. providing information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

e. supporting, collaborating, and engaging stakeholders in the prevention of sexual exploitation of children; and

f. reporting annually on the company's implementation of Code-

related activities.[3]

87. Defendants knew or should have known that, compared to other types of businesses,[4] hotels play a critical role in sex trafficking ventures and serve as "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers[.]" *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

88. Defendants knew or should have known that "[t]he hospitality industry is in a unique position to identify and report human trafficking due to its perceived

---

[3] *See* ECPAT-USA, *The Tourism Child-Protection Code of Conduct*, available at www.ecpatusa.org/code/ (last visited Feb. 11, 2022).

[4] *Cf. Sun Tr. Banks, Inc. v. Killebrew*, 266 Ga. 109, 111 (1995) (Sears, J., concurring) ("[T]he banking industry itself anticipates that criminal activity will frequently occur at ATMs."); *Killebrew v. Sun Trust Banks*, 221 Ga. App. 679, 680-81 (1996) (physical precedent only) ("it would be difficult to say that a criminal occurrence at an ATM is unforeseeable as a matter of law. Indeed, such a conclusion could be reached only by turning 'foreseeability' into a legal term of art totally divorced from its meaning in everyday usage.")

anonymity… From check-in to check-out there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property… With proper training, a front desk agent or a housekeeper can notice that something is not right and respond."[5]

89. Defendants knew or should have known that, without a venue or crime scene, a sex trafficking venture ceases to exist.

90. At all relevant times, Defendants knew or should have known that there was a heightened risk that sex trafficking could take place at its facility as compared to taking place at other locations because of: (i) extensive private sector / non-profit publications informing the public that motels were a hotbed of sex trafficking, (ii) extensive federal / state / local government testimony and press quotations informing the public that low income motels were a particular hotbed of sex trafficking, and (iii) the general nature of Defendants' business involving renting private rooms cheaply by the day with each room having a bed where trafficking could occur.

---

[5] *See* https://www.ecpatusa.org/hotel-training (last visited Feb. 7, 2022).

**b. The Online Reviews**

91. Defendants had actual knowledge of the publicly available online Google, My Business, Priceline, Trip Advisor, etc., reviews of their establishments that reported prostitution, sex trafficking, and other illicit activities occurred at their hotels.

92. Concerning the Knights Inn, those reviews, state in part, as follows:

a. Ghetto bookers and hoes and **tricks prostitutes** here

b. . . .**prostitutes** hanging around outside of the hotel **someone even approached me** with my daughter in hand about picking a girl up for him. . .

c. . . .he appeared to be a **pimp with prostitutes** in a room a few doors down from us. . .people giving this place over 1 star must be part of the **pimps and prostitutes**. . .

d. **Nothing but drugs and prostitutes** at that hotel!!!

e. . . . There are **women selling sex** there. . .

f. . . . Definitely **a crack motel**. . .

g. . . . There was a **shooting** outside my door the first night there.

(bolding added for emphasis; all other emphasis in original)

93. The online reviews provided Defendants with actual or constructive knowledge of sex trafficking, commercial sex, and the foreseeable risk of future sex trafficking ventures at Defendants' Knights Inn.

**c. The Law Enforcement Activity**

94. Defendants had actual or constructive knowledge of law enforcement activity reporting widespread prostitution, sex trafficking, and other illicit activities occurring at Defendants' Knights Inn.

95. Notable reports regarding Defendants' Knights Inn include the following:

a. On July 13, 2013, DeKalb County Police Department VICE Unit responded to Defendants' hotel for purposes of meeting a prostitute, Ayla Jones, who posted advertisements online through backpage.com. At some point after entering Ms. Jones room at Defendants' hotel, she was placed under arrest for prostitution.

b. On October 31, 2013, DeKalb County Police Department VICE Unit responded to Defendants' hotel for purposes of meeting prostitutes who posted advertisements online through backpage.com. At some point after entering room 110 at Defendants' hotel, two 19-year-old females were arrested for prostitution.

c. On May 20, 2014, DeKalb County Police Department VICE Unit responded to Defendants' hotel for purposes of meeting a prostitute who posted advertisements online through backpage.com. At some point after entering room 107 at Defendants' hotel, a minor, 17-year-old female, was placed under arrest for prostitution.

d. Officers with DeKalb County Police Department responded to Defendants' hotel on September 15, 2014, to investigate the double murder that occurred in room 212.

e. On April 15, 2015, DeKalb County Police Department VICE Unit responded to Defendants' hotel for purposes of meeting a prostitute who posted advertisements online through backpage.com. As result of

this investigation, a 17-year-old minor female was placed under arrest for prostitution and Brandon Frazer was arrested for pimping and keeping a place of prostitution at Defendants' hotel.

f. On March 3, 2016, DeKalb County Police Department VICE Unit responded to Defendants' hotel and arrested Latosha McCoy for prostitution and keeping a place of prostitution at Defendant's hotel.

g. On March 3, 2016, DeKalb County Police Department VICE Unit responded to Defendants' hotel and arrested Latosha McCoy for prostitution and keeping a place of prostitution at Defendant's hotel.

h. On March 16, 2016, DeKalb County Police Department VICE Unit responded to Defendants' hotel for purposes of meeting a prostitute who posted advertisements online through backpage.com. As result of this investigation, Keondra Payne was placed under arrest for prostitution and Martavious Payne was arrested for pimping and keeping a place of prostitution at Defendants' hotel.

i. On March 30, 2016, DeKalb County Police Department VICE Unit responded to Defendants' hotel for purposes of meeting a prostitute who posted advertisements online through backpage.com. As result of this investigation, Armani Hernandez was placed under arrest for prostitution and Betric Walton was arrested for pimping and keeping a place of prostitution at Defendants' hotel.

j. On April 6, 2016, DeKalb County Police Department VICE Unit responded to Defendants' hotel for purposes of meeting a prostitute who posted advertisements online through backpage.com. As result of this investigation, Kenya Morris and Brittnay Dean were placed under arrest for prostitution.

k. On April 13, 2016, DeKalb County Police Department VICE Unit responded to Defendants' hotel for purposes of meeting a prostitute who posted advertisements online through backpage.com. As result of this investigation, Deigh Thomas was placed under arrest for prostitution.

l. On September 12, 2016, an adult female reported to DeKalb County Police Department, in addition to the FBI, that she was trafficked for sex from Defendant's hotel from July through September of 2016.

96. Based on the numerous arrests, investigations, and police reports, Defendants knew or should have known of the sex trafficking and prostitution ventures operating out of their Knights Inn prior to Plaintiff's sex trafficking.

**d. The Signs and Symptoms of Plaintiff's Trafficking**

97. Regarding Plaintiff, Defendants and/or their employees observed the vast majority of the evidence that the Department of Homeland Security ("DHS") posts as guidelines to identify and prevent of sex trafficking for hotel staff to be vigilant in observing. Specifically, Defendants observed:

a. signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

b. lack freedom of movement or are constantly monitored;

c. persons who have no control over or possession of money or ID;

d. persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e. requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

f. the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g. extended stay with few or no personal possessions in the room;

h. excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i. the same person reserves multiple rooms;

j. a room is rented hourly, less than a day, or for an atypical extended stay;

k. attempts to sell items to or beg from patrons or staff;

l. cars in the parking lot regularly parked backward, so the license plates are not visible;

m. loitering and solicitation of male patrons; and

n. persons asking staff or patrons for food or money.[6]

98. Regarding Plaintiff, Defendants and/or their employees observed evidence that the organization End Child Prostitution and Trafficking (ECPAT-USA) has listed as specific indicators of human trafficking that hotel staff should recognize to combat trafficking including: paying for rooms using cash, paying for multi-day stays one day at a time, escorts various men into the room and lingers until they leave, watching the door, room is frequented by different men, insists on little or no housekeeping, excessive requests for towels and sheets, wearing

---

[6] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, available at https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited Feb 10, 2022).

the same attire or attire that is revealing or inappropriate for the weather, excess lingerie, discarded condoms and lubricants, use of websites with adult classified ads and possessing few personal belongings.[7]

99. Defendants' staff was familiar with Plaintiff's trafficker due to the trafficker staying at Defendants' hotel to traffic victims on multiple occasions for multiple days.

## V. Proximate Cause and Damages under the TVPRA

100. Plaintiff's sex trafficking at Defendants' Knights Inn was a foreseeable and preventable result of Defendants failing to implement reasonable, appropriate, and adequate measures to deter sex trafficking at its hotel and failing to prevent Plaintiff's continued victimization by ignoring her obvious, well-known signs and indicators of sex trafficking.

101. As a direct and proximate result of Defendants' actions, Plaintiff suffered substantial physical, emotional, and psychological harm and other damages.

---

[7] *See* ECPAT-USA, *Human Trafficking Indicators*, available at https://www.ecpatusa.org/s/ECPATUSA_hotelindicatorsheets.pdf (last visited Feb 11, 2022).

102. Defendants are jointly and severally liable with the trafficker and any other non-party actors who participated in the trafficking for the indivisible injuries that the venture proximately caused to Plaintiff.

103. Defendants are liable for Plaintiff's damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

104. Plaintiff brings each and every claim for damages permissible under the law against Defendants for injuries suffered in the incidents at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, and all compensatory, special, actual, general, and punitive damages permissible under the law, including, but not limited to:

a. Personal injuries;

b. Past, present and future pain and suffering;

c. Disability;

d. Disfigurement;

e. Mental anguish;

f. Loss of the capacity for the enjoyment of life;

g. Loss of earning capacity;

h. Lost wages;

i. Diminished capacity to labor;

j. Incidental expenses;

k. Past, present and future medical expenses;

l. Permanent injuries;

m. Attorney's fees;

n. Punitive damages; and

o. Consequential damages to be proven at trial.

105. Punitive damages should be imposed upon Defendants without limitation or cap for its actions which are explained more fully above.

106. Defendants are also liable for paying Plaintiff's attorneys' fees and litigation expenses pursuant to the TVPRA.

107. Each of the forgoing acts and omissions constitute an independent act of negligence on the part of the Defendants, and one or more or all the above stated acts were the proximate cause of the injuries and damages sustained by the Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff pray for a judgment against Defendants and for the following:

1) That process and summons issue requiring each Defendant to appear as provided by law to answer the allegations of the Complaint;

2) Plaintiff be awarded actual damages in amounts to be shown at trial;

3) Plaintiff be awarded all general, special, compensatory, economic, and other allowable damages in accordance with the enlightened conscience of an impartial jury from the Defendants;

4) Plaintiff be awarded her attorneys' fees and case expenses as allowed by law;

6) Punitive damages be imposed upon the Defendants;

7) Plaintiff be awarded a trial by jury; and

8) Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

This 21st day of March 2024.

*<u>/s/ Matthew B. Stoddard</u>*
Matthew B. Stoddard
Ga. Bar No.: 558215
Patrick J. Hannon
Ga. Bar No.: 074321
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307

P: 470-467-2200
matt@legalhelpga.com
pat@legalhelpga.com